**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): _17-3413_

Caption [use short title]

Motion for: _To strike supplemental appendix filed by BORISKIN and Goldberger_

_WEAVER_
_V_
_BORISKIN_

RECEIVED
U.S. COURT OF APPEALS
CLERK'S OFFICE
2018 APR 13 PM 1:09

Set forth below precise, complete statement of relief sought:

_To strike the supplemental appendix filed by appellees SARA Z. BORISKIN and GENA Goldberger for being impertinent immaterial, scandalous, unnecessarily inserted into the appeal and a deliberate fraud_

MOVING PARTY: _EVERETTE WEAVER_          OPPOSING PARTY: _SARA Z. BORISKIN, ESQ_

☐ Plaintiff          ☐ Defendant
☒ Appellant/Petitioner   ☒ Appellee/Respondent

MOVING ATTORNEY: _EVERETTE Weaver-Prose_   OPPOSING ATTORNEY: _BERKman, Henoch, peterson_

[name of attorney, with firm, address, phone number and e-mail]

_827 Route 82_                          _100 Garden City PLAZA_
_Hopewell Junction, NY 12533_           _GARDEN CITY, NY 11530_
_914-490-1855_                          _516-222-6200_

Court- Judge/ Agency appealed from: _E.D.N.Y | CAROL BAGLEY AMON_

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☒ Yes   ☐ No (explain): _____

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☐ Yes ☐ No
Has this relief been previously sought in this court?   ☐ Yes ☐ No
Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:
☐ Unopposed ☒ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☒ Yes ☐ No ☐ Don't Know

Is oral argument on motion requested?   ☐ Yes ☒ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☒ No  If yes, enter date: _____

Signature of Moving Attorney:
_Everett Weaver_   Date: _04/12/2018_   Service by: ☐ CM/ECF ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

-----------------------------------------------------------------------------------------------------------------

EVERETTE WEAVER

Plaintiff- Appellant

v                                                                  Docket No.17-3413

SARA Z. BORISKIN, Esq

GENA GOLDBERGER, Esq

CITIMORTGAGE, Inc.

KIM KRAKOVIAK

PATRICK J. HACKETT, Esq

ALEXANDER KLESTOV

SCOTT B. GROUP, Esq

BRANDON D. LEWIS

KATHLEEN R. FITZPATRICK, Esq &

NINA KHAIMOVA, Esq

Defendants-Appellees

-----------------------------------------------------------------------------------------------------x

## MOTION TO STRIKE SUPPLEMENTAL APPENDIX FILED BY APPELLEES SARA Z. BOROSKIN AND GENA GOLDBEGER

Appellant Everette Weaver hereby moves the Court for an order striking the

supplemental appendix filed by appellees Sara Z. Boriskin and Gena Goldberger

on March 26, 2018, Doc. Nos. 85, 86 & 87 for being impertinent, immaterial,

1

scandalous, unnecessarily inserted into the appeal and a deliberate fraud, pursuant to rule 12 (f) of the Federal Rules of Civil Procedure and CPLR 3024 (b), prohibit Boriskin and Goldberger from using the referenced documents because the matter has not come to finality, the tenants who live rent free in the subject property from August 2008 to present because of illegal tactics by their attorney John Seymour James were smuggled into the Country by traffickers from their native island of Barbados and currently using Fake documents, their true identity are a mystery, the matter is under investigation and the illegal aliens are being represented by attorney John James who specializes in political asylum, and as grounds states;

1. John Seymour James who represents the tenants living in the subject property filed a notice of appeal on behalf of the illegal aliens currently living in the United States by using Fake documents with names that are not their true birth names.

2. Weaver filed a motion to dismiss the appeal and on October 2, 2017 the appellate Division, Second Department entered a decision and order dismissing the appeal filed by attorney John James.

   **Exhibit A**. Decision and order from the appellate Division, Second Department dated October 2, 2017.

2

3. Public record shows that on May 13, 2010 Sara Z. Boriskin executed an assignment of mortgage for a property located at 119-27 199 Street, Saint Albans, New York 11412 purporting to be assistant Secretary of MERS. **Exhibit B.** Assignment of mortgage executed by Sara Z. Boriskin on May 13, 2010 purporting to be assistant secretary of MERS.

4. Public record shows that on August 11, 2010 Sara Z. Boriskin executed an assignment of mortgage for a property located at 943 Rockaway Avenue, Brooklyn, New York 11212 purporting to be assistant Secretary of MERS. **Exhibit C.** Assignment of mortgage executed by Sara Z. Boriskin on August 11, 2010 purporting to be assistant Secretary of MERS.

5. According to the resume of Sara Z. Boriskin taken from her Linkedin page, Boriskin was manager of the foreclosure Department of the law firm of Berkman, Henoch, Peterson, Peddy & Fenchel, P.C. at the time she executed the assignment of mortgages purporting to be assistant Secretary of MERS. **Exhibit D**. Resume of Sara Z. Boriskin taken from her Linkedin page.

6. Public record also shows that on January 10, 2011 Sara Z. Boriskin executed an assignment of mortgage for a property located at 238-70 116th

3

Road, Elmont, New York 11003 purporting to be assistant Secretary of MERS.

**Exhibit E.** Assignment of mortgage executed by Sara Z. Boriskin on January 10, 2011 purporting to be assistant Secretary of MERS.

7. Court records shows that four days later on January 14, 2011, a complaint was filed by the law firm of Berkman, Henoch, Peterson, Peddy & Fenchel, P.C. against Marva Cudjoe, the owner of 238-70 116th Road, Elmont, New York 11003.

8. Court records also shows that six days later on January 20, 2011 Alexander Klestov served Marva Cudjoe with a summons and complaint.

**Exhibit F.** Affidavit of service upon Marva Cudjoe by Alexander Klestov.

## <u>THE CONSPIRACY</u>

On Wednesday March 28, 2018 the United States attorney for the Southern District of New York announced a lawsuit against the law firm of Rosicki, Rosicki & Associates for systematically overbilling Fannie Mae for foreclosure expenses and the case is assigned to Judge Jed Rakoff of the Southern District of New York.

The first paragraph of page 2 of the press release from the United States attorney states, "From May 2009 through the present ("covered period"), ROSICKI, a law

4

firm based in Plainview, New York, that specializes in mortgage foreclosures, acted as counsel to various mortgage servicing companies, and in that capacity effectuated mortgage foreclosures on Fannie Mae-owned loans. ENTERPRISE was a service-of-process company wholly owned and controlled by the two founding partners of Rosicki, and Paramount was a title search company also wholly owned and controlled by the same Rosicki Partners.

Throughout the covered period, Rosicki, Enterprise and Paramount perpetrated a scheme whereby Rosicki exclusively engaged Enterprise and Paramount purportedly to serve process and perform title searches that were required to complete mortgage foreclosures on Fannie Mae loans.

In reality, however, Enterprise and Paramount engaged third-party vendors to perform the majority of the work, and then applied exponential markups, as much as 750%, to those vendors bills for foreclosure-related services, while adding little if any value to the services that the vendors had performed. ENTERPRISE and PARAMOUNT submitted their marked-up expenses, which significantly exceeded market rates, to ROSICKI.

Rosicki in turn billed the mortgage servicers for those inflated expenses, which Rosicki represented were the actual expenses incurred for the foreclosure-related services, with knowledge that the mortgage servicers would submit claims to

5

Fannie Mae for full reimbursement of the expenses. Defendants submission of these fraudulently inflated expenses caused Fannie Mae to pay millions of dollars for falsely inflated foreclosure expenses."

Public records shows that the law firm of Berkman, Henoch, Peterson & Peddy, P.C. perpetrated a scheme whereby the law firm retained PDY Process Inc., which is owned by Patrick J. Hackett, Esq and located within his law practice.

PDY Process then contracted with Alexander Klestov to serve Weaver, Meade, Cudjoe and Beale which has been admitted in the last paragraph of page 4 of the answer Brief for Boriskin and Goldberger.

Alexander Klestov filed false affidavit of service in the cases above and the affidavits of service are defective because they failed to list the process serving entity's address and telephone number as required by rules of the City of New York, title 6, Department of consumer affairs, Subchapter 23 of Chapter 2 of title 20 of the Administrative Code, § 2-234 & § 2-235.

It appears that the law firm of Berkman, Henoch, Peterson & Peddy, P.C., engaged in a similar conspiracy just like the law firm of Rosicki, Rosicki & Associates to bill homeowners' excessive fees and to file false affidavits of service with the Court in order to get default judgments, just like the one that CitiMortgage got against Weaver, Meade, Cudjoe and Beale.

6

In the cases of Meade, Cudjoe and Beale, the assignment of mortgages were all executed by Sara Z. Boriskin purporting to be assistant Secretary of MERS.

However, according to the resume of Sara Z. Boriskin taken from her Linkedin page, Boriskin was the managing attorney of the foreclosure Department of the law firm of Berkman, Henoch, Peterson, Peddy & Fenchel, P.C., at the time she executed the assignment of mortgages purporting to be assistant Secretary of MERS.

It appears that the law firm of Berkman, Henoch, Peterson, & Peddy, P.C., along with Patrick Hackett form an entity called PDY Process, Inc., which was located within the law firm of Patrick J. Hackett.

Berkman, Henoch, Peterson & Peddy, P.C. would then retain PDY Process Inc., as the process server, who then subcontract the work to Alexander Klestov.

When Klestov submitted his invoices to PDY Process Inc., it appears that PDY then submit inflated invoices to the law firm of Berkman, Henoch, Peterson & Peddy, P.C. which were then passed on to their victims such as Weaver, Meade, Cudjoe and Beale and the parties benefited from the conspiracy.

The parties also used Alexander Klestov to submit false affidavits of service to the Court which were notarized by Patrick J. Hackett which is not only self-serving, but a conflict of interest.

7

# CONSUMER PROTECTION BUREAU FINED CITI $29 MILLION

The consumer financial protection bureau fined CitiFinancial and CitiMortgage a total of $29 million for foreclosure related issues, in the matter of CitiMortgage, Inc., Administrative proceeding file No. 2017-CFPB-0005.

On January 23, 2017 CitiMortgage agreed to a consent order which states on page 4 under bureau findings and conclusions, "The Bureau finds the following:

4. Respondent is incorporated in New York, headquartered in O'Fallon, Missouri, and is a subsidiary of Citibank, N.A. Respondent is a covered person, as that term is defined by 12 U.S.C. § 5481 (6). Respondent is also a service provider, as that term is defined by 12 U.S.C. § 5481 (26), and a servicer under regulation X, 12 C.F.R. § 1024.2 (b).

5. During the relevant period, respondent serviced residential mortgage loans on behalf of Citibank, N.A, Government-sponsored entities, and various investors, including by handling loss mitigation activities and initiating foreclosure proceedings.

**Exhibit G**. Consent order.

## FINDINGS AND CONCLUSIONS AS TO RESPONDENT'S NOII LETTER

**6.** When respondent received an incomplete loss mitigation application 45 days or more before a scheduled foreclosure sale, respondent's practice was to send borrowers a notice advising them of the additional documents and information necessary to complete their loss mitigation applications.

7. During the relevant period, respondent sent approximately 41, 000 NOII letters to affected consumers.

8. The NOII letters respondent sent to affected consumers requested all documents that could potentially be relevant to loss mitigation applications generally.

9. For a portion of the relevant period, from January 10, 2014, through August 19, 2014, the first page of respondent's NOII letter sent to affected consumers included the following directive in bold, capitalized text: **"WE MUST HAVE THE DOCUMENTS LISTED BELOW TO PROCESS YOUR LOSS MITIGATION APPLICATION."** The NOII letter respondent sent to affected consumers then listed dozens of documents and forms that may or may not have been applicable to a borrower's loss mitigation application.

10. The NOII letters respondent sent to affected consumers did not specify which of the listed documents were actually necessary for a particular borrower to submit in order to complete his or her mitigation application. Respondent did not, in fact,

9

need the affected consumers to submit all of the documents listed in the NOII letter in order to complete their loss mitigation application.

11. For example, the NOII letter respondent sent to affected consumers requested, among other things, the following documents: "Form 1065 (Partnership tax return) with all schedules"; Form 1120S (S-Corporation tax return) with all schedules"; "Social security ward letter"; "Trust agreement"; "Broker's statements at year-end"; "Teacher contract"; "Pension statement"; and a Most current year of real estate tax bill for rental."

12. Near the end of the NOII letter respondent sent some affected consumers, respondent included the following statement in bolded text: "**Remember, you must provide the necessary documentation to complete your application**"

**13.** In some cases, the NOII letter respondent sent to affected consumers also requested documents that borrowers had already submitted.

14. In certain circumstances, respondent's representatives communicated with affected consumers via phone or email to inform them of the actual documents the borrowers needed to submit to complete their loss mitigation applications. However, respondent also sent some of these same borrowers an additional letter requesting a large numbers of documents inapplicable to their circumstances, or documents that the borrowers had already submitted.

15. Some affected consumers also received conflicting messages from respondent's representatives regarding the documents that they needed to submit to complete their loss mitigation applications, including that they had to submit documents previously submitted. Affected consumers also complained about the lack of communication by respondent's representatives, and the assignment of multiple representatives during the loss mitigation application process.

## VIOLATION OF RESPA AND REGULATION X

16. When a servicer receives an incomplete loss mitigation application 45 days or more before a scheduled foreclosure sale, Section 1024. 41 (b) (2) (i) (B) of regulation X requires the servicer, within five days of receiving the application, to provide a written notice "stating the additional documents and information the borrower must submit" to complete his or her loss mitigation application. 12 C.F.R. § 1024.41 (b) (2) (i) (B).

17. As described in paragraphs 6-14, the NOII letter respondent sent to affected consumers did not state which documents and information those borrowers actually needed to submit to complete their loss mitigation applications. In some cases, the NOII letter respondent sent to affected consumers requested documents that the borrowers had previously submitted.

18. Therefore, respondent violated RESPA, 12 U.S.C. § 2601 et Seq., and Section 1024.41 (b) (2) (i) (B) of its implementing regulation X.

## VIOLATION OF THE CFPA

19. Sections 1031 (a) and 1036 (a) (1) (B) of the CFPA, 12 U.S.C. §§ 5531 (a) and 5536 (a) (i) (B) prohibit "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536 (a) (1) (B).

20. As described in paragraphs 6-14, in connection with servicing residential mortgage loans, respondent has represented, expressly or impliedly, that borrowers must submit all the documents listed in the NOII letter in order to complete their loss mitigation application and for respondent to process that loss mitigation application.

21. In fact, respondent actually needed a much smaller universe of documents to process borrowers' loss mitigation applications and borrowers did not have to submit all of the documents listed in the NOII letter to complete their loss mitigation application. In some cases, respondent also represented in its NOII letter that borrowers needed to submit documents that they had already provided.

22. Therefore, respondent engaged in deceptive acts or practices in violation of Sections of 1031 (a) and 1036 (a) (1) of the CFPA, 12 U.S.C. §§ 5531 (a), 5536 (a) (1).

12

## CONCLUSION

The facts and evidence submitted in this motion to strike shows that the Boriskin and Goldberger included in volume II of their supplemental appendix the following impertinent, immaterial, unnecessary and scandalous documents;

Complaint in Weaver v Radix et al., dated June 16, 2009. (SA 207).

Judge Radix happens to be from the island of Barbados from where the illegal aliens were smuggled.

Transcript of proceeding in the case of Weaver v. Kurtz. (SA 245).

Report and recommendation in Weaver v Vaughan. (SA283).

Memorandum and order of Judge Bagley Amon. (SA 303).

Supplemental order of Judge Bagley Amon. (SA 308).

Judgment entered by Judge Amon on October 11, 2012. (SA310).

Appellant is a pro se litigant and not an attorney.

However, the evidence submitted in this motion shows that Boriskin and Goldberger have made misrepresentations and false representations their standard operating procedure and their reason for including the documents above in the appeal, is to deflect away from the crimes they have committed as officers of the

Court which requires referral to the United States attorney for a criminal investigation as required by title 18 U.S.C. § 4.

Wherefore, appellant Weaver moves this Court to enter an order granting his motion striking the supplemental appendix filed by Boriskin and Goldberger for being impertinent, immaterial, scandalous, and unnecessarily inserted into the appeal, prohibit Boriskin and Goldberger from using the documents listed in their supplemental appendix because the matter has not come to finality, the tenants live rent free in three apartments in the subject property from August 2008 to present compliments of the illegal tactics of their attorney John James who is a major campaign contributor to Kings County Supreme Court Judges and specializes in political asylum according to his online advertising, the tenants were smuggled into the Country by traffickers from their native island of Barbados and used Fake documents to apply for food stamp and welfare benefits, their true identity is a mystery, and the matter is currently under investigation, and grant such other and further relief as the Court may deem just and proper under the circumstance.

Dated: April 12, 2018

Respectfully Submitted

Everette Weaver

Plaintiff-Appellant

827 Route 82

Hopewell Junction, NY 12533

914-490-1855

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

CAPTION:

EVERETTE WEAVER

v.

SARA Z. BORISKIN, Esq, et al;

**CERTIFICATE OF SERVICE***

Docket Number: 17-3413

I, EVERETTE WEAVER , hereby certify under penalty of perjury that
(print name)

on April 12, 2018 , I served a copy of motion To strike
(date)

supplemental appendix filed by Boriskin and Goldberger
(list all documents)

by (select all applicable)**

___ Personal Delivery          ✓ United States Mail          ___ Federal Express or other
                                                                  Overnight Courier

___ Commercial Carrier          ___ E-Mail (on consent)

on the following parties:

| Berkman, Henoch, Peterson, Peddy and Fenchel, 100 Garden city plaza, Garden city, NY 11530 |
|---|
| Name                    Address                    City          State      Zip Code |

| Hackett Law P.c., 401 Franklin Ave, Suite 300, Garden city, NY 11530 |
|---|
| Name                    Address                    City          State      Zip Code |

| David A. Gallo and Associates, 99 Powerhouse Road, 1st Floor, Roslyn Heights, NY |
|---|
| Name                    Address                    City          State      Zip Code |

| Akerman, LLP 666 Fifth Avenue, 20th Floor, New york, NY 10103 |
|---|
| Name                    Address                    City          State      Zip Code |

*A party must serve a copy of each paper on the other parties, or their counsel, to the appeal or
proceeding. The Court will reject papers for filing if a certificate of service is not simultaneously
filed.

**If different methods of service have been used on different parties, please complete a separate
certificate of service for each party.

04/12/2018
Today's Date

_Elliott Weaver_
Signature

# EXHIBIT A

# 𝕾𝖚𝖕𝖗𝖊𝖒𝖊 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝖙𝖍𝖊 𝕾𝖙𝖆𝖙𝖊 𝖔𝖋 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐
## 𝕬𝖕𝖕𝖊𝖑𝖑𝖆𝖙𝖊 𝕯𝖎𝖛𝖎𝖘𝖎𝖔𝖓: 𝕾𝖊𝖈𝖔𝖓𝖉 𝕵𝖚𝖉𝖎𝖈𝖎𝖆𝖑 𝕯𝖊𝖕𝖆𝖗𝖙𝖒𝖊𝖓𝖙

M238583
E/sl

RANDALL T. ENG, P.J.
JEFFREY A. COHEN
JOSEPH J. MALTESE
ANGELA G. IANNACCI, JJ.

---

2016-13092

DECISION & ORDER ON MOTION

Citimortgage, Inc., respondent,
v Everette Weaver, et al., appellants,
et al., defendants.

(Index No. 18430/09)

---

Motion by the appellant Everette Weaver on appeals from an order of the Supreme Court, Kings County, dated September 26, 2016, inter alia, to dismiss the appeal by the appellants Elma Gibbs and Shelly Parker on the ground that they are not aggrieved. Application by the appellants Elma Gibbs and Shelly Parker pursuant to 22 NYCRR 670.8(d)(2) to enlarge until October 30, 2017, the time to perfect their appeal.

Upon the papers filed in support of the motion and the papers filed in opposition thereto, and upon the papers filed in support of the application and no papers having been filed in opposition or in relation thereto, it is

ORDERED that the branch of the motion which is to dismiss the appeal by the appellants Elma Gibbs and Shelly Parker is granted and the appeal by the appellants Elma Gibbs and Shelly Parker is dismissed, without costs or disbursements (see CPLR 5511); and it is further,

ORDERED that the motion is otherwise denied; and it is further,

ORDERED that the application is denied as academic.

ENG, P.J., COHEN, MALTESE and IANNACCI, JJ., concur.

ENTER:

*Aprilanne Agostino*

Aprilanne Agostino
Clerk of the Court

October 2, 2017

CITIMORTGAGE, INC. v WEAVER

# EXHIBIT B

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2010081800489001001E2FE6

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 4 |
|---|---|

**Document ID: 2010081800489001**     Document Date: 05-13-2010     Preparation Date: 08-18-2010
Document Type: ASSIGNMENT, MORTGAGE
Document Page Count: 2

| PRESENTER: | RETURN TO: |
|---|---|
| HOLD FOR PICK-UP-SUZANNE MANGO | HOLD FOR PICK UP- SUZANNE MANGO |
| ADVANTAGE FORECLOSURE-FCL65183 | BERKMAN, HENOCH, PETERSON & PEDDY |
| 410 NEW YORK AVENUE | 100 GARDEN CITY PLAZA |
| HUNTINGTON, NY 11743 | GARDEN CITY, NY 11530 |
| 631-549-7721 | 631-549-7721 |
| mdaly@advantagetitle.com | |

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| QUEENS | 12655 | 40 | Entire Lot | | 119-27 199TH STREET |

**Property Type:** DWELLING ONLY - 1 FAMILY

### CROSS REFERENCE DATA

**CRFN:** 2007000188571

### PARTIES

| ASSIGNOR/OLD LENDER: | ASSIGNEE/NEW LENDER: |
|---|---|
| MERS | BAC HOME LOANS SERVICING LP |
| 3 BURLINGTON WOODS, 2ND FLOOR | 7105 CORPORATE DRIVE |
| BURLINGTON, MA 01803 | PLANO, TX 75024 |

   x   Additional Parties Listed on Continuation Page

### FEES AND TAXES

| Mortgage | | Filing Fee: | |
|---|---|---|---|
| Mortgage Amount: | $ 0.00 | | $ 0.00 |
| Taxable Mortgage Amount: | $ 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | $ 0.00 |
| TAXES: County (Basic): | $ 0.00 | NYS Real Estate Transfer Tax: | |
|      City (Additional): | $ 0.00 | | $ 0.00 |
|      Spec (Additional): | $ 0.00 | | |
|      TASF: | $ 0.00 | | |
|      MTA: | $ 0.00 | | |
|      NYCTA: | $ 0.00 | | |
|      Additional MRT: | $ 0.00 | | |
|       TOTAL: | $ 0.00 | | |
| Recording Fee: | $ 47.00 | | |
| Affidavit Fee: | $ 0.00 | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**

Recorded/Filed     08-31-2010 10:33
City Register File No.(CRFN):
       **2010000293830**

*Annette M Hill*

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2010081800489001001C2D66

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 2 OF 4 |
|---|---|

| Document ID: 2010081800489001 | Document Date: 05-13-2010 | Preparation Date: 08-18-2010 |
|---|---|---|

Document Type: ASSIGNMENT, MORTGAGE

---

**PARTIES**
**ASSIGNOR/OLD LENDER:**
H & R BLOCK MORTGAGE CORP.
3 BURLINGTON WOODS, 2ND FLOOR
BURLINGTON, MA 01803

---

**PARTIES**
**ASSIGNEE/NEW LENDER:**
COUNTRYWIDE HOME LOANS SERVICING LP
7105 CORPORATE DRIVE
PLANO, TX 75024

R+R

Section:
Block: 12655
Lot: 40
Document Number:    000131934596MN35

BERKMAN, HENOCH, PETERSON, PEDDY & FENCHEL, P.C.
100 GARDEN CITY PLAZA
GARDEN CITY, NY 11530

## ASSIGNMENT OF MORTGAGE

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.** AS NOMINEE FOR H&R BLOCK MORTGAGE CORPORATION having an address at 3 Burlington Woods, Second Foor, Burlington, Massachusetts, 01803, Assignor

in consideration of ten and no/100 ($10.00) Dollars and other good and valuable consideration paid by:

**BAC HOME LOANS SERVICING, LP** F/K/A COUNTRYWIDE HOME LOANS SERVICING, LP Assignee, having an address of 7105 Corporate Drive, Plano, Texas 75024, hereby assigns unto the assignee, a certain mortgage made by WARREN O. MEADE AND STEPHEN A. MEADE  given to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR H&R BLOCK MORTGAGE CORPORATION to secure payment of the sum of 385,000.00 Dollars and interest, dated 11/02/2006 and recorded on 04/12/2007, in the Office of the Register of the County of QUEENS in CRFN 2007000188571  covering premises 119-27 199TH STREET, SAINT ALBANS, NY 11412 : SEE EXHIBIT A, ATTACHED, FOR LEGAL DESCRIPTION

Together with the bond or obligation described in said mortgage, and the moneys due to grow due thereon with interest.

**TO HAVE AND TO HOLD**, the same unto the assignee, and to the successors, legal representatives and assigns of the assignee forever.

This assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

This Assignment is made to and accepted by the Assignee without warranty or representation on the part of the assignor and without recourse to the assignor in any event whatsoever.

Said Assignment has an effective date of June 1, 2009.

IN WITNESS WHEREOF, the Assignor has duly executed the Assignment on May 13, 2010.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR H&R BLOCK MORTGAGE CORPORATION

BY: _____
Sara Z. Boriskin, Asst. Secretary

STATE OF   NEW YORK    )
                       )ss.:
COUNTY OF· NASSAU      )

On the 13 day of May in the year 2010 before me, the undersigned, personally appeared Sara Z. Boriskin, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
NOTARY PUBLIC

KELLY ANN BURTT
Notary Public, State of New York
No. 01BU6155622
Qualified in Nassau County
Commission Expires Nov. 13, 2010

SEAL

## ADVANTAGE FORECLOSURE SERVICES, INC.

### Title No. FCL-65183-10  (File No. N/A)

### SCHEDULE A
### DESCRIPTION

**Block 12655 and Lot 40**

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough and County of Queens, City and State of New York, bounded and described as follows:

BEGINNING at a point on the Easterly side of 199th Street, formerly Amity Street, 60 feet wide, distant 260 feet Southerly from the corner formed by the intersection of the Easterly side of 199th Street with the Southerly side of 119th Avenue formerly known as St. Marks Avenue, 50 feet wide, as said St. Marks Avenue is laid out on Map of St. Albans Heights Realty Co., Borough of Queens and filed June 29th, 1906 under Map No. 1188;

RUNNING THENCE Easterly on a line forming an interior angle of 90 degrees 12 minutes 50 seconds with the said Easterly side of 199th Street a distance of 96.41 feet;

THENCE Southerly at right angles, with the last mentioned course a distance of 40 feet;

THENCE Westerly and again at right angles to the last mentioned course a distance of 96.56 feet to the said Easterly side of 199th Street;

THENCE Northerly along the said Easterly side of 199th Street, 40 feet to the point or place of BEGINNING.

**Premises known as 119-27 199th Street, Saint Albans, New York**

# EXHIBIT C

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2010083100345001001EAB1C

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 5 |
|---|---|

**Document ID:** 2010083100345001  Document Date: 08-11-2010  Preparation Date: 08-31-2010
Document Type: ASSIGNMENT, MORTGAGE
Document Page Count: 3

| PRESENTER: | RETURN TO: |
|---|---|
| HOLD FOR PICK-UP-SUZANNE MANGO | HOLD FOR PICK UP- SUZANNE MANGO |
| ADVANTAGE FORECLOSURE-FCL67278 | BERKMAN, HENOCH, PETERSON & PEDDY |
| 410 NEW YORK AVENUE | 100 GARDEN CITY PLAZA |
| HUNTINGTON, NY 11743 | GARDEN CITY, NY 11530 |
| 631-549-7721 | 631-549-7721 |
| mdaly@advantagetitle.com | |

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BROOKLYN | 3626 | 104 | Entire Lot | | 943 ROCKAWAY AVENUE |
| | **Property Type:** | DWELLING ONLY - 1 FAMILY | | | |

**CROSS REFERENCE DATA**

CRFN: 2007000244920
x  Additional Cross References on Continuation Page

**PARTIES**

| ASSIGNOR/OLD LENDER: | ASSIGNEE/NEW LENDER: |
|---|---|
| MERS | FEDERAL NATIONAL MORTGAGE ASSOCIATION |
| 1595 SPRING HILL ROAD | 7105 CORPORATE DRIVE |
| VIENNA, VA 22182 | PLANO, TX 75024 |
| | |
| x  Additional Parties Listed on Continuation Page | |

**FEES AND TAXES**

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | | |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | | |
| MTA: | $ | 0.00 | **CITY OF NEW YORK** | | |
| NYCTA: | $ | 0.00 | Recorded/Filed     09-08-2010 13:08 | | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | $ | 0.00 | **2010000302555** | | |
| Recording Fee: | $ | 52.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

*Annette M. L. Hill*

**City Register Official Signature**

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2010083100345001001CA99C

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 2 OF 5 |
|---|---|

**Document ID: 2010083100345001**     Document Date: 08-11-2010     Preparation Date: 08-31-2010

Document Type: ASSIGNMENT, MORTGAGE

**CROSS REFERENCE DATA**
CRFN: 2005000116052
CRFN: 2007000244918
CRFN: 2007000244919

**PARTIES**
**ASSIGNOR/OLD LENDER:**
COUNTRYWIDE HOME LOANS INC.
1595 SPRING HILL ROAD
VIENNA, VA 22182

RtR

Block: 3626
Lot: 104
Document Id: 000156588323MN35

BERKMAN, HENOCH, PETERSON, PEDDY & PENCHEL, P.C.
100 GARDEN CITY PLAZA
GARDEN CITY, NY 11530

## ASSIGNMENT OF MORTGAGE

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC. having an address at 1595 Spring Hill Road, Vienna, VA 22182, Assignor

in consideration of ten and no/100 ($10.00) Dollars and other good and valuable consideration paid by:

FEDERAL NATIONAL MORTGAGE ASSOCIATION Assignee, having an address of 7105 Corporate Drive, Plano, TX 75024, hereby assigns unto the assignee, a Consolidation, Extension and Modification Agreement ("Consolidation Agreement) dated 1/30/2007 by GRANVILLE BEALE given to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC. to secure payment of the sum of $336,000.00 Dollars and interest. Said Consolidation Agreement was recorded in the office of the Register of the County of KINGS on the 5/10/2007 in CRFN: 2007000244920 and combined and consolidated the following 2 mortgages:

**Mortgage (i)** dated 12/27/2004 executed by GRANVILLE BEALE, to FFFC F/N/O FIRST FRANKLIN FINANCIAL CORP. to secure the sum of 261,250.00 and recorded in the office of the Register of the County of KINGS on the 2/25/2005 in CRFN: 2005000116052, having been assigned by assignment recorded in the office of the Register of the County of KINGS being the same mortgage which was assigned as follows:

    Assignor: FFFC F/N/O FIRST FRANKLIN FINANCIAL CORP.

    Assignee: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC.

    Dated: February 5, 2007

    Recorded: May 10, 2007

    CRFN: 2007000244918

    **Mortgage (ii)** dated 1/30/2007 executed by GRANVILLE BEALE, to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC. to secure the sum of 80,380.38 and recorded in the office of the Register of the County of KINGS on the 5/10/2007 in CRFN: 2007000244919.

Covering premises 943 ROCKAWAY AVENUE, BROOKLYN, NY 11212: SEE EXHIBIT A, ATTACHED, FOR LEGAL DESCRIPTION

Together with the bond or obligation described in said mortgage, and the moneys due to grow due thereon with interest.

**TO HAVE AND TO HOLD,** the same unto the assignee, and to the successors, legal representatives and assigns of the assignee forever.

This assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

This Assignment is made to and accepted by the Assignee without warranty or representation on the part of the assignor and without recourse to the assignor in any event whatsoever.

IN WITNESS WHEREOF, the Assignor has duly executed the Assignment on ___August 11, 2010___.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC.

BY: _____

SARA Z BORISKIN
ASSISTANT SECRETARY

STATE OF New York )
                  )ss.:
COUNTY OF Nassau  )

On the 11th day of August in the year 2010 before me, the undersigned, personally appeared SARA Z. BORISKIN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

NOTARY PUBLIC

JESSICA A. CHAPPELL
Notary Public, State of New York
No. 01CH4981747
Qualified in Nassau County
Commission Expires May 20, 20 11

**SEAL**

# ADVANTAGE FORECLOSURE SERVICES, INC.

## Title No. FCL-67278-10  (File No. N/A)

## SCHEDULE A
## DESCRIPTION

### Block 3626 and Lot 104

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the Easterly side of Rockaway Avenue distant 77.25 feet Northerly from the corner formed by the intersection of the Easterly side of Rockaway Avenue and the Northerly side of Hegeman Avenue;

RUNNING THENCE Easterly at right angles to the Easterly side of Rockaway Avenue 100.09 feet;

THENCE Northerly parallel with the Easterly side of Rockaway Avenue 18 feet;

THENCE Westerly at right angles to the Easterly side of Rockaway Avenue 100.09 feet to the Easterly side of Rockaway Avenue;

THENCE Southerly along the Easterly side of Rockaway Avenue 18 feet to the point or place of BEGINNING.

**Premises known as 943 Rockaway Avenue, Brooklyn, New York**

# EXHIBIT D

Sara Boriskin | LinkedIn

## Sara Boriskin

**Managing Partner at RAS Boriskin, LLC**

Greater New York City Area   Law Practice

### Join LinkedIn and access Sara Boriskin's full profile. It's free!

As a LinkedIn member, you'll join 300 million other professionals who are sharing connections, ideas, and opportunities.

- **See who you and Sara Boriskin know in common**
- **Get introduced to Sara Boriskin**
- **Contact Sara Boriskin directly**



### Sara Boriskin's Overview

| | |
|---|---|
| Current | **Managing Partner** at RAS Boriskin, LLC |
| Past | Managing Attorney - Foreclosure Department at Berkman, Henoch, Peterson, Peddy & Fenchel, P.C. |
| | Associate Attorney at Berkman Henoch Peterson & Peddy, P.C. |
| Education | Brooklyn Law School |
| Connections | 485 connections |

### Sara Boriskin's Summary

I am the Managing Partner at RAS Boriskin, LLC, a boutique creditors rights firm in New York focusing on foreclosure, bankruptcy, REO, eviction, litigation and loss mitigation. After 9+ years at Berkman, Henoch, Peterson, Peddy & Fenchel, P.C., I resigned my position as Managing Attorney to build a practice, something I've always aspired to do.

### Sara Boriskin's Experience

**Managing Partner**

**RAS Boriskin, LLC**

March 2013 – Present (1 year 3 months)  Westbury, New York

**Managing Attorney - Foreclosure Department**

**Berkman, Henoch, Peterson, Peddy & Fenchel, P.C.**

Partnership; 51-200 employees; Law Practice industry

August 2010– February 2013 (2 years 7 months)

**Associate Attorney**

**Berkman Henoch Peterson & Peddy, P.C.**

Partnership; 51-200 employees; Law Practice industry

January 2004– July 2010 (6 years 7 months)

### Sara Boriskin's Skills & Expertise

| Litigation | Intellectual Property | Foreclosures | Loss Mitigation | Evictions | Bankruptcy | Creditors' Rights | REO |
|---|---|---|---|---|---|---|---|

### Sara Boriskin's Education

**Brooklyn Law School**

2000 – 2003

### Contact Sara for:

## View Sara Boriskin's full profile to...

- See who you and **Sara Boriskin** know in common
- Get introduced to **Sara Boriskin**
- Contact **Sara Boriskin** directly

View Sara's full profile

Not the Sara Boriskin you were looking for? View more »

# EXHIBIT E



NASSAU COUNTY CLERK'S OFFICE
ENDORSEMENT COVER PAGE

Recorded Date: 01-25-2011
Recorded Time: 12:02:54 p

   Liber Book: M  35625
   Pages From:      959
        To:      961

Record and Return To:
BERKMAN HENOCH PETERSON PEDDY & FENCHEL
100 GARDEN CITY PLAZA
GARDEN CITY, NY  11530

   Control
   Number:  1272
   Ref #:
   Doc Type: M23  ASSIGN MORTGAGE

   Refers to: Book: M 31400 Page: 936

| Location: | Section | Block | Lot | Unit |
|---|---|---|---|---|
| HEMPSTEAD (2820) | 0032 | 00623-00 | 00413 | |

| | |
|---|---|
| Taxes Total | .00 |
| Recording Totals | 130.00 |
| Total Payment | 130.00 |

AAR001

THIS PAGE IS NOW PART OF THE INSTRUMENT AND SHOULD NOT BE REMOVED
MAUREEN O'CONNELL
COUNTY CLERK

201101250127 2

Section: 32
Block: 623
Lot: 413

RfR

BERKMAN, HENOCH, PETERSON, PEDDY & FENCHEL, P.C.
100 GARDEN CITY PLAZA
GARDEN CITY, NY 11530

## ASSIGNMENT OF MORTGAGE

4318 miller Rd., Flint, MI

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.** AS NOMINEE FOR COUNTRYWIDE BANK, NA having an address at 1595 Spring Hill Road, Vienna, VA 22182, Assignor

in consideration of ten and no/100 ($10.00) Dollars and other good and valuable consideration paid by:

**BAC HOME LOANS SERVICING, LP** F/K/A COUNTRYWIDE HOME LOANS SERVICING LP Assignee, having an address of 7105 Corporate Drive, Plano, TX 75024, hereby assigns unto the assignee, a certain mortgage made by MARVA CUDJOE given to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR COUNTRYWIDE BANK, NA to secure payment of the sum of $348,000.00 Dollars and interest, dated 12/22/2006 and recorded on 01/08/2007, in the Office of the Clerk of the County of NASSAU in LIBER 31400 PAGE 936 covering premises 238-70 116TH ROAD, ELMONT, NY 11003: SEE EXHIBIT A, ATTACHED, FOR LEGAL DESCRIPTION

Together with the bond or obligation described in said mortgage, and the moneys due to grow due thereon with interest.

**TO HAVE AND TO HOLD,** the same unto the assignee, and to the successors, legal representatives and assigns of the assignee forever.

This assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

This Assignment is made to and accepted by the Assignee without warranty or representation on the part of the assignor and without recourse to the assignor in any event whatsoever.

IN WITNESS WHEREOF, the Assignor has duly executed the Assignment on January 10, 2011.

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC. AS NOMINEE FOR
COUNTRYWIDE BANK, NA

BY: _____
Sara Z. Boriskin
Assistant Secretary

STATE OF NEW YORK )
)ss.:
COUNTY OF NASSAU )

On the 10th day of January in the year 2011 before me, the undersigned, personally appeared Sara Z. Boriskin , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
NOTARY PUBLIC

**LEGIBILITY POOR**
**FOR MICROFILMING**

KIM WALKER
Notary Public, State of New York
No. 01WA6011718
Qualified in Nassau County
Commission Expires August 17, 2014

## ADVANTAGE FORECLOSURE SERVICES, INC.

### Title No. FCL-70198-10 (File No. N/A)

### SCHEDULE A
### DESCRIPTION

**Section 32, Block 623 and Lot 413**

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in Elmont, Town of Hempstead, County of Nassau and State of New York, known and designated as and by a portion of Lots 45 and 46 in Block 623 on a certain map entitled, "Map of Parkway Terrace, Section 6 and amending part of Map of Parkway Terrace (Case No. 3907) situated at Elmont, lying wholly within the Town of Hempstead, Nassau County, N.Y., surveyed and drawn by William H. Parry, Inc., Land Surveyors, May 1946", and filed in the Office of the Clerk of the County of Nassau on April 3, 1947 as Map No. 4390, which said portions of said lots when taken together are more particularly bounded and described according to said Map as follows:

BEGINNING at a point on the Southerly side of 116th Road, distant 158.51 feet Westerly from the extreme Westerly end of an arc connecting the Southerly side of 116th Road with the Westerly side of 240th Street;

RUNNING THENCE Southerly at right angles to 116th Road, 105.76 feet;

THENCE Westerly on a line at an interior angle of 86 degrees 48 minutes 03 seconds with the last mentioned course, 41.06 feet;

THENCE Northerly again at right angles to 116th Road, 103.46 feet to the Southerly side of 116th Road;

THENCE Easterly along the Southerly side of 116th Road, 41.00 feet to the point or place of BEGINNING.


**Premises known as 238-70 116th Road, Elmont, New York**

# EXHIBIT F

| STATE OF NEW YORK | COUNTY OF NASSAU | INDEX # : 630/11 |
|---|---|---|
| SUPREME COURT | | Date Filed: January 14, 2011 |
| DISTRICT: | | |

ATTORNEY(S) : :  BERKMAN, HENOCH, PETERSON, PEDDY &     PH: 516-222-6200
ADDRESS: 100 Garden City Plaza  Garden City  NY  11530     File No.: BHLS-98069

*BAC HOME LOANS SERVICING, L.P. F/K/A COUNTRYWIDE HOME LOANS SERVICING, LP,*

Plaintiff(s)/Petitioner(s)

*vs*

*MARVA CUDJOE, ET AL.,*

JAN 2 0 2011

Defendant(s)/Respondent(s)

STATE OF NEW YORK, COUNTY OF NASSAU                          **AFFIDAVIT OF SERVICE**

Alexander Klestov , being duly sworn deposes and says that deponent is not a party to this action, is over the age of 18 years and resides in the State of NEW YORK.

That on 1/17/2011 at 2:42 PM, at 238-70 116TH ROAD, ELMONT, NY 11003, deponent served the within SUMMONS AND VERIFIED COMPLAINT which contains the additional notice requirements in accordance with RPAPL §1320, along with a copy of the Homeowner's Foreclosure Notice as required by RPAPL §1303 notice was served on colored paper other than the color of the SUMMONS AND VERIFIED COMPLAINT and the notice was in bold, fourteen-point type, with the title of the Notice in bold, twenty-point type, bearing index# 630/11, filed 1/14/2011 on ANTON LEWIS S/H/A JOHN DOE #1, Defendant therein named,

#1 INDIVIDUAL   By delivering a true copy of each to said recipient personally; deponent knew the person served to be the person described as said person therein.

#2 CORPORATION   By delivering thereat a true copy of each to _____ personally, deponent knew the person so served
to be the _____ of the corporation, and authorized to accept service on behalf of the corporation.

#3 SUITABLE
AGE PERSON   By delivering a true copy of each to _____ MARVA CUDJOE _____ a person of suitable age and discretion.
[X]
Said premises is recipient's: [ ] actual place of business   [X] dwelling house (usual place of abode) within the state.

#4 AFFIXING
TO DOOR   By affixing a true copy of each to the door of said premises, which is recipient's: [ ] actual place of business   [ ] dwelling house
[ ]   (place of abode) within the state.

Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, having called thereat
on the _____ day of _____ at
on the _____ day of _____ at

on the _____ day of _____ at
on the _____ day of _____ at
Address confirmed by

#5 MAIL COPY   On _____ January 20, 2011 _____ , deponent completed service by depositing a true copy of each document to the above address
[X]   in a 1st Class postpaid properly addressed envelope marked "Personal and Confidential" in an official depository under the exclusive care
and custody of the United States Post Office in the State of New York.

#6 DESCRIPTION   A description of the Defendant, or other person served, or spoken to on behalf of the Defendant is as follows:
[X]   Sex: Female   Color of skin: Black   Color of hair: Black/Gray   Age: 51 - 65 Yrs.   Height: 5' 4" - 5' 8"
(use with #1, 2 or 3)   Weight: 131 - 160 Lbs.   Other Features:

#7 WIT. FEES   _____ the authorized witness fee and / or traveling expenses were paid (tendered) to the recipient.

#8 MILITARY SRVC   Deponent asked person spoken to whether the recipient was presently in military service of the United States Government or of the State
[X]   of New York and was informed that recipient was not. Recipient wore ordinary civilian clothes and no military uniform.

#9 OTHER   PREMISES HAS FEWER THAN FIVE DWELLING UNITS.
[X]

**Tenant's Notice** On Thursday, January 20, 2011 deponent mailed by Certified Mail, Return Receipt requested and 1st Class Mail, a copy of the Tenant's Foreclosure Notice on its own page as required by RPAPL 1303 notice was served on colored paper other than the color of the summons and complaint, and the notice was in bold fourteen-point type, with the title of the notice in bold twenty-point type.

Sworn to before me on _____ January 20, 2011 _____

SUSAN L. EGLAND
STATE OF NEW YORK
NO. 4904232, NASSAU COUNTY
TERM EXPIRES AUGUST 31, 2013

Alexander Klestov
Server's Lic # 1305484
Invoice/Work Order # 0809038

# EXHIBIT  G

# UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING

File No. 2017-CFPB-0005

| | |
|---|---|
| In the Matter of:<br><br>CitiMortgage, Inc. | **CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) has reviewed the mortgage servicing practices of CitiMortgage, Inc. (Respondent, as defined below) and has identified the following law violations: Respondent informed borrowers seeking loss mitigation that they were required to submit a substantial number of documents in order to complete their application, many of which were not applicable to borrowers' specific financial circumstances and were not required to complete their loss mitigation application, in violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 *et seq.*, Section 1024.41(b) of its implementing Regulation X, 12 C.F.R. Part 1024, and Sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1). In some cases, Respondent requested that borrowers submit documents for their loss mitigation applications that borrowers had previously submitted, also in violation of Regulation X and the CFPA. Under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

# I
## Jurisdiction

1.     The Bureau has jurisdiction over this matter under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, and RESPA, 12 U.S.C. § 2601 *et seq.*, and its implementing Regulation X, 12 C.F.R. Part 1024.

# II
## Stipulation

2.     Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated January [   ], 2017 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

# III
## Definitions

3.     The following definitions apply to this Consent Order:

   a. "Affected Consumers" includes borrowers who were sent a Notice of Incomplete Information (NOII) letter by Respondent between January 10, 2014, and December 4, 2014, after providing little or no income or hardship information along with their initial loss mitigation application, with the exception of borrowers who:

      i. were current at the time they received CMI's non-compliant (b)(2) notice, who never submitted a document in response to CMI's non-

compliant (b)(2) notice, and who have remained current on their
mortgage up to the Effective Date of the Consent Order; AND/OR

ii.   were current at the time they received CMI's non-compliant (b)(2)
notice, who never submitted a document in response to CMI's non-
compliant (b)(2) notice, and who never subsequently submitted
another loss mitigation application up to the Effective Date of the
Consent Order; AND/OR

iii.  submitted a complete loss mitigation application after January 10,
2014, for which a decision was provided after January 10, 2014, and
who subsequently submitted another loss mitigation application, and
was sent CMI's non-compliant (b)(2) notice.

b.  "Board" means Respondent's duly-elected and acting Board of Directors.

c.  "Effective Date" means the date on which the Consent Order is issued.

d.  "Loss mitigation application" means an oral or written request for a loss
mitigation option that is accompanied by any information required by a
servicer for evaluation for a loss mitigation option. 12 C.F.R. § 1024.31.

e.  "Loss mitigation option" means an alternative to foreclosure offered by the
owner or assignee of a mortgage loan that is made available through the
servicer to the borrower, including a short-sale or a deed-in-lieu of
foreclosure. 12 C.F.R. § 1024.31; 12 C.F.R. Pt. 1024, Supp. I, comment 31
(Loss mitigation option)-1.

f.  "NOII letter" means the Notice of Incomplete Information letter that
Respondent sent pursuant to 12 C.F.R. § 1024.41(b)(2)(i)(B) to Affected
Consumers.

g.  "Regional Director" means the Regional Director for the Northeast Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his/her delegate.

h.  "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order.

i.  "Relevant Period" includes the period from January 10, 2014, to December 4, 2014.

j.  "Respondent" means CitiMortgage, Inc., and its successors and assigns.

## IV
## Bureau Findings and Conclusions

The Bureau finds the following:

4.    Respondent is incorporated in New York, headquartered in O'Fallon, Missouri, and is a subsidiary of Citibank, N.A. Respondent is a "covered person," as that term is defined by 12 U.S.C. § 5481(6). Respondent is also a "service provider," as that term is defined by 12 U.S.C. § 5481(26), and a "servicer" under Regulation X, 12 C.F.R. § 1024.2(b).

5.    During the Relevant Period, Respondent serviced residential mortgage loans on behalf of Citibank, N.A., government-sponsored entities, and various investors, including by handling loss mitigation activities and initiating foreclosure proceedings.

### Findings and Conclusions as to Respondent's NOII Letter

6.     When Respondent received an incomplete loss mitigation application 45 days or more before a scheduled foreclosure sale, Respondent's practice was to send borrowers a notice advising them of the additional documents and information necessary to complete their loss mitigation applications.

7.     During the Relevant Period, Respondent sent approximately 41,000 NOII letters to Affected Consumers.

8.     The NOII letters Respondent sent to Affected Consumers requested all documents that could potentially be relevant to loss mitigation applications generally.

9.     For a portion of the Relevant Period, from January 10, 2014, through August 19, 2014, the first page of Respondent's NOII letter sent to Affected Consumers included the following directive in bold, capitalized text: "**WE MUST HAVE THE DOCUMENTS LISTED BELOW TO PROCESS YOUR LOSS MITIGATION APPLICATION.**" The NOII letter Respondent sent to Affected Consumers then listed dozens of documents and forms that may or may not have been applicable to a borrower's loss mitigation application.

10.     The NOII letters Respondent sent to Affected Consumers did not specify which of the listed documents were actually necessary for a particular borrower to submit in order to complete his or her loss mitigation application. Respondent did not, in fact, need the Affected Consumers to submit all of the documents listed in the NOII letter in order to complete their loss mitigation application.

11.     For example, the NOII letter Respondent sent to Affected Consumers requested, among other things, the following documents: "Form 1065 (Partnership Tax Return) with all schedules"; "Form 1120S (S-Corporation Tax Return) with all

schedules"; "Social Security Award Letter"; "Trust Agreement"; "Broker's Statements at Year-End"; "Teacher contract"; "Pension Statement"; and a "Most current year of Real estate tax bill for Rental."

12.     Near the end of the NOII letter Respondent sent to some Affected Consumers, Respondent included the following statement in bolded text: "**Remember, you must provide the necessary documentation to complete your application**."

13.     In some cases, the NOII letter Respondent sent to Affected Consumers also requested documents that borrowers had already submitted.

14.     In certain circumstances, Respondent's representatives communicated with Affected Consumers via phone or email to inform them of the actual documents the borrowers needed to submit to complete their loss mitigation applications. However, Respondent also sent some of these same borrowers an additional letter requesting a large numbers of documents inapplicable to their circumstances, or documents that the borrowers had already submitted.

15.     Some Affected Consumers also received conflicting messages from Respondent's representatives regarding the documents that they needed to submit to complete their loss mitigation applications, including that they had to submit documents previously submitted. Affected Consumers also complained about the lack of communication by Respondent's representatives, and the assignment of multiple representatives during the loss mitigation application process.

**Violation of RESPA and Regulation X**

16.     When a servicer receives an incomplete loss mitigation application 45 days or more before a scheduled foreclosure sale, Section 1024.41(b)(2)(i)(B) of Regulation X

requires the servicer, within five days of receiving the application, to provide a written notice "stat[ing] the additional documents and information the borrower must submit" to complete his or her loss mitigation application. 12 C.F.R. § 1024.41(b)(2)(i)(B).

17.    As described in Paragraphs 6–14, the NOII letter Respondent sent to Affected Consumers did not state which documents and information those borrowers actually needed to submit to complete their loss mitigation applications. In some cases, the NOII letter Respondent sent to Affected Consumers requested documents that the borrowers had previously submitted.

18.    Therefore, Respondent violated RESPA, 12 U.S.C. § 2601 *et seq.*, and Section 1024.41(b)(2)(i)(B) of its implementing Regulation X.

## Violation of the CFPA

19.    Sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B) prohibit "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).

20.    As described in Paragraphs 6-14, in connection with servicing residential mortgage loans, Respondent has represented, expressly or impliedly, that borrowers must submit all the documents listed in the NOII letter in order to complete their loss mitigation application and for Respondent to process that loss mitigation application.

21.    In fact, Respondent actually needed a much smaller universe of documents to process borrowers' loss mitigation applications and borrowers did not have to submit all of the documents listed in the NOII letter to complete their loss mitigation application. In some cases, Respondent also represented in its NOII letter that borrowers needed to submit documents that they had already provided.

22.     Therefore, Respondent engaged in deceptive acts or practices in violation of Sections 1031(a) and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1).

**V**

**Conduct Provisions**

**IT IS ORDERED**, under Sections 1053 and 1055 of the CFPA, that:

23.     Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate Section 1024.41(b)(2)(i)(B) of Regulation X, 12 C.F.R. § 1024.41(b)(2)(i)(B), and Sections 1031(a) and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1), as follows and must take the following affirmative actions:

   a. When Respondent does not possess information or documentation from borrowers who have submitted a loss mitigation application sufficient to know what specific information or documentation is necessary to complete a loss mitigation application, Respondent must send notices of incomplete loss mitigation applications that comply with 12 C.F.R. § 1024.41(b)(2)(i)(B) by:

      i. Explaining in plain language the purpose of any enclosed form that a borrower must complete in connection with his or her application, including a description of any documentation the form requires the borrower to submit; and

      ii. Enclosing any form that a borrower must complete with his or her application.

   b. When Respondent possesses more extensive information or documentation from borrowers who have submitted a loss mitigation application sufficient to

inform the borrower of what specific information or documentation is necessary to complete a loss mitigation application, Respondent must send notices of incomplete loss mitigation applications that comply with 12 C.F.R. § 1024.41(b)(2)(i)(B) by:

    i.   Clearly identifying any required documents that have not been submitted by the borrower;

    ii.   Explaining in plain language the purpose of any enclosed form that a borrower must complete in connection with his or her application, including a description of any documentation the form requires the borrower to submit;

    iii.   To the extent certain applicable income and financial documents are valid for a limited period of time, clearly identifying the length of time for which those specified documents are valid; and

    iv.   Enclosing any form that a borrower must complete with his or her application.

c.   Respondent, and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, in connection with servicing residential home mortgages, may not misrepresent, or assist others in misrepresenting:

    i.   The documents and information borrowers are actually required to submit to complete their loss mitigation application;

    ii.   The documents and information Respondent must have to process a borrower's loss mitigation application; or

    iii.  That borrowers must submit documents to complete their loss mitigation application when the borrower has already submitted a current version of those documents.

24.    For Affected Consumers who did not receive a decision on their loss mitigation application, Respondent must take the following affirmative actions:

a.  Place a hold on all foreclosure-related activity for the accounts of all Affected Consumers who are included in the outreach and review described in subsections (b) and (c) below;

b.  Make at least 4 attempts (using at least one attempt by first-class mail) to contact each Affected Consumer whose mortgage loan is still active, whose servicing rights are owned by Respondent, and who Respondent was servicing as of January 13, 2017, to determine his or her continued interest in loss mitigation options; and

c.  Review and evaluate loss mitigation applications submitted by Affected Consumers as a result of this outreach within 15 days of receipt of a complete loss mitigation application.

# VI

## Compliance Plan

**IT IS FURTHER ORDERED** that:

25.    Within 60 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of non-objection a comprehensive compliance plan designed to ensure that Respondent's practice of notifying borrowers who submit an incomplete loss mitigation application of the additional documents and

information necessary to complete their application complies with all applicable Federal

consumer financial laws and the terms of this Consent Order (Compliance Plan). The

Compliance Plan must include, at a minimum:

      a.   Detailed steps for addressing each action required by this Consent Order;

      b.   Templates of all notices that Respondent currently sends to borrowers

          who have submitted an incomplete loss mitigation application;

      c.   Templates of all new or revised notices Respondent seeks to send to

          borrowers to comply with the terms of this Consent Order; and

      d.   Specific timeframes and deadlines for the implementation of the steps

          described above.

26.    The Regional Director will have the discretion to make a determination of

non-objection to the Compliance Plan or direct Respondent to revise it. If the Regional

Director directs Respondent to revise the Compliance Plan, the Respondent must make

the revisions and resubmit the Compliance Plan to Regional Director within 30 days.

27.    After receiving notification that the Regional Director has made a

determination of non-objection to the Compliance Plan, Respondent must implement

and adhere to the steps, recommendations, deadlines, and timeframes outlined in the

Compliance Plan.

28.    If Respondent materially revises its notices to borrowers who submit an

incomplete loss mitigation application within 5 years of the Regional Director's

determination of non-objection to the Compliance Plan, Respondent must submit its

revised notices to the Regional Director for review and non-objection.

## VII

## Role of the Board

**IT IS FURTHER ORDERED** that:

29.    The Board, or a relevant Committee thereof, must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

30.    Although this Consent Order requires the Respondent to submit certain documents for the review or non-objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal consumer financial laws and this Consent Order.

31.    In each instance that this Consent Order requires the Board to ensure adherence to, or perform certain obligations of Respondent, the Board, or a relevant Committee thereof, must:

> a.   Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;
>
> b.   Require timely reporting by management to the Board on the status of compliance obligations; and
>
> c.   Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## VIII

### Order to Pay Redress

**IT IS FURTHER ORDERED** that:

32.     Within 10 days of the Effective Date, Respondent must reserve or deposit into a segregated deposit account $17 million for the purpose of providing redress to Affected Consumers as required by this Section.

33.     Within 90 days of the Effective Date, Respondent must submit to the Regional Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Regional Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Redress Plan, Respondent must make the revisions and resubmit the Redress Plan to the Regional Director within 30 days. After receiving notification that the Regional Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

34.     The Redress Plan must apply to all Affected Consumers and:

   a.  Specify how Respondent will identify all Affected Consumers;

   b.  Provide processes for providing redress covering all Affected Consumers;

   c.  Include a description of the following:

      i.   Methods used to compile a list of potential Affected Consumers;

      ii.  Methods used to calculate the amount of redress to be paid to each Affected Consumer;

iii. Procedures for issuance and tracking of redress to Affected Consumers; and

iv. Procedures for monitoring compliance with the Redress Plan.

35.    The Redress Plan must, at a minimum, require Respondent to provide $400 in redress to each Affected Consumer.

36.    The Redress Plan must describe the process for providing redress for Affected Consumers, and must include the following requirements:

a. Respondent must mail a bank check to each Affected Consumer along with a Redress Notification Letter (as defined below);

b. Respondent must send the bank check by United States Postal Service first-class mail, address correction service requested, to the Affected Consumer's last known address as maintained by the Respondent's records;

c. Respondent must make reasonable attempts to obtain a current address for any Affected Consumer whose Redress Notification Letter and/or redress check is returned for any reason, using the National Change of Address System, and must promptly re-mail all returned letters and/or redress checks to current addresses, if any; and

d. Processes for handling any unclaimed funds.

37.    With respect to redress paid to Affected Consumers, the Redress Plan must include:

a. The form of the letter ("Redress Notification Letter") to be sent notifying Affected Consumers of the redress; and

b. The form of the envelope that will contain the Redress Notification Letter. The letter must include language explaining the manner in which the amount of

redress was calculated; and a statement that the provision of the refund payment is in accordance with the terms of this Consent Order.

c. Respondent must not include in any envelope containing a "Redress Notification Letter" any materials other than the approved letters and redress checks, unless Respondent has obtained written confirmation from the Regional Director that the Bureau does not object to the inclusion of such additional materials.

38.    Within 90 days from completion of the Redress Plan, Respondent must submit a Redress Plan Report to the Regional Director, which must include Respondent's Internal Audit department's review and assessment of Respondent's compliance with the terms of the Redress Plan, including:

a. The methodology used to determine the population of Affected Consumers;

b. The Redress Amount for each Affected Consumer;

c. The total number of Affected Consumers;

d. The procedures used to issue and track redress payments;

e. The amount, status, and planned disposition of all unclaimed redress payments; and

f. The work of independent consultants that Respondent has used, if any, to assist and review its execution of the Redress Plan.

39.    After completing the Redress Plan, if the amount of redress provided to Affected Consumers is less than $17 million within 30 days of the completion of the Redress Plan, Respondent must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the difference between the amount of redress provided to Affected Consumers and $17 million.

40.    The Bureau may use these remaining funds to pay additional redress to Affected Consumers. If the Bureau determines, in its sole discretion, that additional redress is wholly or partially impracticable or otherwise inappropriate, or if funds remain after the additional redress is completed, the Bureau will deposit any remaining funds in the U.S. Treasury as disgorgement. Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

41.    Respondent may not condition the payment of any redress to any Affected Consumer under this Consent Order on that Affected Consumer waiving any right.

## IX

## Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

42.    Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $3 million to the Bureau.

43.    Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

44.    The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

45.    Respondent must treat the civil money penalty paid under this Consent Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

    a.    Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

    b.    Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

46.    To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action (Penalty Offset). If the court in any Related Consumer Action grants such a Penalty Offset, Respondent must, within 30 days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

47.    In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will

accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

48.    Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

49.    Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

50.    Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Regional Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## XI

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

51.    Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in

Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case no later than 14 days after the development.

52.    Within 120 days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Regional Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board or a relevant committee thereof, which, at a minimum:

  a.  Describes in detail the manner and form in which Respondent has complied with this Order; and

  b.  Attaches a copy of each Order Acknowledgment obtained under Section XII, unless previously submitted to the Bureau.

# XII
## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that,

53.    Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

54.    For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

55.    Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 *et seq.*, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

## XIII

### Recordkeeping

**IT IS FURTHER ORDERED** that

56.    Respondent must create, or if already created, must retain for at least 5 years from the Effective Date, the following business records:

a. All documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau.

b. All documents and records pertaining to the Redress Plan, described in Section VIII above.

c. For each Affected Consumer: the consumer's name, address, phone number, email address, and the date on which his or her loss mitigation application was submitted.

57.    Respondent must retain the documents identified in Paragraph 56 for the duration of the Consent Order.

58.    Respondent must make the documents identified in Paragraph 56 available to the Bureau upon the Bureau's request.

## XIV

## Notices

**IT IS FURTHER ORDERED** that:

59.    Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re* CitiMortgage Inc., File No. 2017-CFPB-0005," and send them either:

    a.    By overnight courier (not the U.S. Postal Service), as follows:

        Regional Director, Northeast Region
        Consumer Financial Protection Bureau
        140 East 45th Street, 4th Floor
        New York, NY 10017

    b.    By first-class mail to the below address and contemporaneously by email to Enforcement_Compliance@cfpb.gov:

        Regional Director, Northeast Region
        Consumer Financial Protection Bureau
        140 East 45th Street, 4th Floor
        New York, NY 10017

## XV
## Compliance Monitoring

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with this Consent Order:

60.    Within 30 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

61.    For purposes of this Section, the Bureau may communicate directly with Respondent, unless Respondent retains counsel related to these communications.

62.    Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

63.    Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

# XVI

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

64.    Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

65.    The Regional Director may, in his/her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he/she determines good cause justifies the modification. Any such modification by the Regional Director must be in writing.

# XVII

## Administrative Provisions

66.    The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 67.

67.    The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

68.    This Consent Order is intended to be, and will be construed as, a final Consent Order issued under Section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

69.    This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

70.    Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

71.    Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with Paragraph 24 and Section VIII to the extent Respondent transfers or seeks to transfer its obligations under these provisions of this Consent Order.

72.    The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

73.    This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

74.    Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing the Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this _23rd_ day of January, 2017.


Richard Cordray
Director
Consumer Financial Protection Bureau